UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROBERT RAYA,<br><br>                    Plaintiff,<br><br>v.<br><br>DAVID BARKA; NOORI BARKA; EVELYN BARKA; CALBIOTECH, INC.; CALBIOTECH, INC. 401(k) PROFIT SHARING PLAN; CALBIOTECH, INC. PENSION PLAN,<br><br>                    Defendants. | Case No.: 19-cv-2295-WQH-AHG<br><br>**ORDER** |
| DAVID BARKA; NOORI BARKA; EVELYN BARKA; CALBIOTECH, INC.; CALBIOTECH, INC. 401(k) PROFIT SHARING PLAN; CALBIOTECH, INC. PENSION PLAN,<br><br>                    Counter Claimants,<br><br>v.<br><br>ROBERT RAYA,<br><br>                    Counter Defendant. | |

HAYES, Judge:

The matter before the Court is the Motion for Summary Judgment filed by Defendants/Counter Claimants David Barka, Noori Barka, Evelyn Barka, Calbiotech, Inc. ("Calbiotech"), Calbiotech, Inc. 401(k) Profit Sharing Plan (the "401(k) Plan"), and Calbiotech, Inc. Pension Plan (the "Pension Plan"). (ECF No. 118.)

## I. BACKGROUND

On December 2, 2019, Plaintiff Robert Raya, proceeding pro se, filed a Complaint against Defendants. (ECF No. 1.) On December 9, 2020, Plaintiff filed a First Amended Complaint ("FAC"). (ECF No. 39.) The FAC alleged that Defendants engaged in illegal conduct relating to the administration of the Pension Plan and 401(k) Plan and unlawfully terminated Plaintiff in retaliation for his requests for plan documents. The FAC brought four claims on behalf of Plaintiff and on behalf of the retirement plans under the Employee Retirement Income Security Act of 1974 ("ERISA"), as well as claims under California state law.

On December 22, 2020, Defendants filed a Motion to Dismiss the FAC. (ECF No. 40.) On June 3, 2021, the Court issued an Order dismissing several claims in the FAC and striking the request for a jury trial. (ECF No. 45.)

On June 17, 2021, Defendants filed an Answer to the FAC and a counterclaim for breach of contract. (ECF No. 46.) The counterclaim alleges that Plaintiff/Counter Defendant (hereinafter, "Plaintiff") breached the terms of a separation agreement by filing complaints with the United States Department of Labor, this lawsuit against Defendants/Counter Claimants (hereinafter, "Defendants"), and a related lawsuit against Calbiotech. On July 8, 2021, Plaintiff filed an Answer to the counterclaim. (ECF No. 50.)

On September 8, 2021, Plaintiff filed the operative Second Amended Complaint ("SAC"), alleging four ERISA claims. (ECF No. 64.) The first claim alleges that Calbiotech, the Pension Plan, the 401(k) Plan, and the plan administrators violated 29 U.S.C. § 1132(a)(1)(B) by not enrolling Plaintiff in the Pension Plan and by failing to make "[a]utomatic or mandatory employer contributions described in 401(k) Plan documents."

*Id.* ¶ 67. The second claim alleges that the fiduciaries of the retirement plans—Defendants Calbiotech, David Barka, Noori Barka, and Evelyn Barka—violated 29 U.S.C. §§ 1109(a) and 1132(a)(2) by failing to lawfully discharge their duties as fiduciaries when they (1) "intentionally withheld plan documents for both retirement plans from participants resulting in missed contributions and losses for both plans"; (2) "failed to disclose the existence of the [ ] Pension Plan ... resulting in a failure to enroll eligible employees and missed contributions to the Pension Plan"; (3) "introduced an invalid, backdated, and fraudulent document," which described the "illegal" and "discriminatory" 2008 Amendment to the Pension Plan; (4) "misled participants regarding Calbiotech['s] [ ] mandatory contributions under the [401(k) Plan] ... resulting in missed employer contributions and losses to the plan"; and (5) "failed to remit employee payroll deductions to 401(k) accounts." *Id.* ¶ 73. The third claim alleges that the same course of conduct by plan fiduciaries harmed Plaintiff in violation of 29 U.S.C. §§ 1109(a) and 1132(a)(3). The fourth claim alleges that David Barka, Noori Barka, and Calbiotech violated 29 U.S.C. §§ 1140 and 1132(a)(3) by terminating Plaintiff "in retaliation [for] [Plaintiff] exercising his rights under ERISA to request [p]lan [d]ocuments." *Id.* ¶ 82. The SAC requests the recovery of benefits under the retirement plans, "the removal of Defendants as fiduciaries and trustees" of the retirement plans, the "appointment of an independent actuary to accurately quantitate total losses suffered," and other relief. *Id.* ¶ 86.

From August 23, 2021, to February 25, 2022, the parties filed eight motions. Plaintiff filed four Motions for Partial Summary Judgment. (ECF Nos. 60, 79, 92, 102.) Defendants filed a Motion to Dismiss (ECF No. 77), a Motion for Partial Judgment or Alternatively Summary Adjudication (ECF No. 83), a Cross-Motion for Legal Findings and Conclusions (ECF No. 97), and a Cross-Motion for Partial Summary Judgment (ECF No. 106). On March 28, 2022, the Court issued an Order adjudicating all pending motions. (ECF No. 114.) The Order granted Defendants summary judgment on "(1) the first claim in the SAC; (2) the second and third claims in the SAC to the extent those claims assert ERISA violations relating to the Pension Plan; and [(3)] the second and third claims in the SAC to

the extent those claims seek payment of benefits under the 401(k) Plan to Plaintiff." *Id.* at 36. The Order further dismissed the fourth claim in the SAC for ERISA interference brought against Defendant Noori Barka. The following claims remain to be adjudicated in this action: (1) Plaintiff's second and third claims against Defendants Calbiotech, David Barka, Noori Barka, and Evelyn Barka for breach of fiduciary duty in the administration of the 401(k) Plan, to the extent those claims seek equitable relief and not payment of benefits; (2) Plaintiff's fourth claim for ERISA retaliatory discharge against Defendants David Barka and Calbiotech; and (3) Defendants' counterclaim for breach of the separation agreement.

On May 31, 2022, Defendants filed the Motion for Summary Judgment. (ECF No. 118.) On June 27, 2022, Plaintiff filed a Response in opposition to the motion. (ECF No. 122.) On July 1, 2022, Defendants filed a Reply. (ECF No. 125.)

## II. FACTS

Plaintiff became a participant in the 401(k) Plan on September 1, 2009, the first day of the plan year. On the day Plaintiff became a participant in the 401(k) Plan, the 401(k) Plan was governed by an Adoption Agreement and Basic Plan Document made effective as of the beginning of the prior plan year, on September 1, 2008. The 2008 Adoption Agreement provides that "[t]he Company's Matching Contribution shall be allocated to eligible Participants who have met the [age and service] requirements … as follows …: An amount and allocation formula as determined by the Board." (ECF No. 118-7 at 3.) The 2008 Basic Plan Document further provides that "[m]atching contributions shall be made to the Plan and promptly allocated to the Matching Contribution Accounts of Participants … and in the amount [specified in the Adoption Agreement]." (ECF No. 118-8 at 2.)

A restated Adoption Agreement and Basic Plan Document were made effective as of September 1, 2011. The 2011 Adoption Agreement and Basic Plan Document contain the same language quoted above as the 2008 documents. (*See* ECF Nos. 118-9 at 3, 118-10 at 2.)

On October 19, 2012, Plaintiff took out an $8,000 loan from his 401(k) account, which contained both employee and employer contributions. An amount of $85.36 was deducted from each of Plaintiff's subsequent paychecks to repay the 401(k) loan. Charts provided to Plaintiff by Principal Financial reflect that each time a "Member Loan Payment" was made, an amount of $14.86 was listed in the "Elective Deferral" column and an amount of $70.50 was listed in the "Employer Discretionary" column. (ECF Nos. 118-18, 118-19.) An additional chart presented by Defendants and produced by Plaintiff in discovery shows the outstanding balance of Plaintiff's loan decreasing by $85.36—the amount deducted from each of Plaintiff's paychecks—each pay period. (*See* ECF No. 118-5.)

Plaintiff received notice that he was terminated from his position at Calbiotech on November 29, 2016. On December 13, 2016, Plaintiff requested plan documents. On December 14, 2016, the third-party administrator of the 401(k) Plan provided Plaintiff with a Summary Plan Description ("SPD") that states that it "describes the [401(k)] Plan as restated effective January 1, 2015." (ECF No. 118-15 at 9.)

On September 1, 2016, the Board of Calbiotech issued a resolution authorizing the adoption of a restatement of the 401(k) Plan for 2016, which states that "the Corporation has maintained the [401(k) Plan)] since 9-1-2011." (ECF No. 122-13 at 2.) A restated Adoption Agreement and Basic Plan Document were adopted on April 3, 2017, effective as of September 1, 2016. The 2016 Adoption Agreement states that the 401(k) Plan was intended to be a Safe Harbor 401(k) plan with an enhanced match of "100% of salary deferrals up to 4% of Plan Compensation." (ECF No. 118-13 at 9.) The 2016 Basic Plan Document provides:

> The Employer may elect [in the Adoption Agreement] to apply the Safe Harbor 401(k) Plan provisions under this Section [ ]. For this purpose, the Plan satisfies the requirements of this Section [ ] if the Plan is a Safe Harbor 401(k) Plan, as described in subsection (a) …. If the Plan qualifies as a Safe Harbor 401(k) Plan, the ADP Test … [and] ACP Test [are] deemed satisfied [subject to additional conditions]. To qualify as a Safe Harbor 401(k) Plan, the requirements under this Section [ ] must be satisfied for the entire Plan

5

19-cv-2295-WQH-AHG

> Year …. [I]t is impermissible to use the ADP and ACP Test for a Plan Year in which the Plan is intended to be a Safe Harbor 401(k) Plan and the requirements of this Section [ ] are not satisfied for the entire Plan Year.

(ECF No. 118-14 at 3.) Subsection (a) further provides that to "qualify as a Safe Harbor 401(k) Plan, the Plan must provide a Safe Harbor Contribution" and must satisfy various requirements, including the provision of advance notice to participants. *Id.* at 3-4.

On November 28, 2018, Plaintiff received an email from a representative of Calbiotech that stated that the 2011 plan documents were "in effect from September 1, 2011 through August 31, 2016." (ECF No. 122-11 at 2.) On February 5, 2019, Defendants produced the Administrative Record to Plaintiff in connection with his administrative claim. The Administrative Record produced to Plaintiff on that date did not include the SPD previously provided to Plaintiff on December 14, 2016, or other plan documents documenting a 2015 restatement of the 401(k) Plan. Defendants later produced to Plaintiff additional plan documents concerning the purported 2015 restatement, including an Adoption Agreement that states that it was adopted on April 26, 2016, and effective as of January 1, 2015. The 2015 Adoption Agreement further provides that "[t]he date specified [as the effective date] for an amended and restated plan … may not be earlier than the first day of the Plan Year during which the amended and restated Plan is adopted by the Plan Sponsor." (ECF No. 125-6 at 5.)

On March 19, 2019, the Department of Labor opened an investigation of the 401(k) Plan. On July 30, 2020, the Department of Labor sent Defendants a letter stating that the Department found "that from January 2015 through December 2019, [Defendants] failed to timely remit $27,729.47 in employee contributions and loan payments and failed to remit $1,182.67 in loan payments withheld from participants' paychecks to the Plan" in violation of ERISA. (ECF No. 122-4 at 3.) The letter further states that the Department of Labor found "that, from September 2016 through December 2019, [Defendants] failed to make mandatory safe harbor employer contributions to the accounts of each eligible participant" in violation of ERISA. *Id.* On December 9, 2020, Defendants responded to the letter,

disputing their liability. On May 11, 2021, the Department of Labor replied, stating that "we believe our original position is correct," but that "[d]espite your refusal to undertake the full corrective action we deem necessary, we have decided that legal action by the Department will not be commenced at this time." (ECF No. 122-6 at 2.)

## III. LEGAL STANDARD

"A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A material fact is one that is relevant to an element of a claim or defense and whose existence might affect the outcome of the suit. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). The materiality of a fact is determined by the substantive law governing the claim or defense. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986).

The moving party has the initial burden of demonstrating that summary judgment is proper. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 153 (1970). Where the party moving for summary judgment bears the burden of proof at trial, the moving party "must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial." *Houghton v. South*, 965 F.2d 1532, 1536 (9th Cir. 1992) (citation omitted). Where the party moving for summary judgment does not bear the burden of proof at trial, "the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325; *see also United Steelworkers v. Phelps Dodge Corp.*, 865 F.2d 1539, 1542-43 (9th Cir. 1989) ("[O]n an issue where the plaintiff has the burden of proof, the defendant may move for summary judgment by pointing to the absence of facts to support the plaintiff's claim. The defendant is not required to produce evidence showing the absence of a genuine issue of material fact with respect to an issue where the plaintiff has the burden of proof. Nor does Rule 56(c) require that the moving party support

its motion with affidavits or other similar materials negating the nonmoving party's claim." (citations omitted)).

If the moving party meets the initial burden, the burden shifts to the opposing party to show that summary judgment is not appropriate. *Anderson*, 477 U.S. at 256; *Celotex*, 477 U.S. at 322, 324. The nonmoving party must "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324. The nonmoving party cannot defeat summary judgment by demonstrating "that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586; *see Anderson*, 477 U.S. at 252 ("The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient."). The pleadings of *pro se* plaintiffs are construed liberally. *See Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1988).

## IV. BREACH OF FIDUCIARY DUTY CLAIMS

Defendants contend that they are entitled to summary judgment on the second and third claims in the SAC for breach of fiduciary duty pursuant to 29 U.S.C. §§ 1132(a)(2) and (a)(3) because "the evidence proves no breach of fiduciary duty occurred." (ECF No. 118-1 at 18.) Defendants contend that there was no breach caused by "'missed contributions' to the 401(k) Plan as alleged by Plaintiff" because Calbiotech "was under no obligation to make any contribution." *Id.* at 21. Defendants contend that there was no breach caused by a failure to remit payroll deductions because "the monies deducted from Plaintiff's paychecks … were in fact remitted … in their entirety." *Id.* Defendants contend that Plaintiff lacks standing to bring claims against Defendants for breach of fiduciary duty. Defendants contend that Plaintiff may not seek the same relief under his second and third claims.

Plaintiff contends that the following evidence demonstrates that Defendants breached their fiduciary duties to the 401(k) Plan: (1) Defendants' failure to make matching contributions to the 401(k) Plan, as required by the 2008 and 2011 plan documents; (2)

Defendants' failure to remit loan payments deducted from participants' paychecks to their 401(k) accounts; and (3) Defendants' failure to make safe harbor matching contributions to the 401(k) Plan. Plaintiff contends that the Department of Labor investigation of the 401(k) Plan demonstrates "that Defendants have breached their fiduciary duties in a manner alleged by Plaintiff"—namely, by failing to make mandatory employer contributions or remit loan payments withheld from participants' paychecks. (ECF No. 122 at 3.) Plaintiff contends that he "does not seek duplicative relief or double recovery" and that "claims under different subsections of ERISA may proceed simultaneously so long as there is no double recovery." *Id.* at 12 (quotation omitted).

### 1. Matching Contributions

The 2008 and 2011 Adoption Agreements each indicate that matching contributions are "permitted" and provide that "[t]he Company's Matching Contribution shall be allocated to eligible Participants who have met the [age and service] requirements … as follows …: An amount and allocation formula as determined by the Board." (ECF Nos. 118-7 at 2-3, 118-9 at 2-3.) The corresponding Basic Plan Documents further provide that "[m]atching contributions shall be made to the Plan and promptly allocated to the Matching Contribution Accounts of Participants … and in the amount [specified in the Adoption Agreement]." (ECF Nos. 118-8 at 2, 118-10 at 2.)

The phrase "an amount … as determined by the Board," (ECF Nos. 118-7 at 3, 118-9 at 3), expressly gives the Board of Calbiotech discretion to set the amount of the matching contribution and does not preclude the Board from setting the amount to zero. The Basic Plan Documents require matching contributions set by the Board to be allocated but do not limit the Board's authority to determine the amount of the contribution. Plaintiff does not present evidence that the Board's discretion in setting the amount of the matching contribution is otherwise limited or that the Board set any matching contribution amounts that were not allocated. The uncontroverted evidence establishes that Defendants did not breach their fiduciary duties by failing to make or allocate matching contributions pursuant to the 2008 and 2011 plan documents.

### 2. Loan Payment Remittances

The record reflects that on October 19, 2012, Plaintiff took out an $8,000 loan from his 401(k) account and that an amount of $85.36 was deducted from each of Plaintiff's subsequent paychecks to repay the loan. However, Plaintiff asserts that only $14.86 of the $85.35 deducted from each of the paychecks was actually remitted by Defendants to Plaintiff's account and that Defendants converted the remainder, in breach of their fiduciary duties.

On January 15, 2019, Principal Financial emailed Plaintiff a chart recording the contributions and loan payments to his 401(k) account. (*See* ECF No. 118-18.) On February 4, 2019, Principal Financial emailed Plaintiff a second chart recording the same contributions and loan payments that contained an additional column not included in the first email and that stated: "It seems during our first email not all of the information was provided." (ECF No. 118-19 at 2.) Other than a difference in which columns were included in the two charts provided to Plaintiff, the charts' data are identical.

The charts show that each time a "Member Loan Payment" was made, an amount of $14.86 was listed in the "Elective Deferral" column and an amount of $70.50 was listed in the "Employer Discretionary" column. (ECF Nos. 118-18, 118-19.) These figures sum to the amount deducted from each of Plaintiff's paychecks for loan repayment, $85.36. (*See, e.g.,* ECF No. 118-17.) The presence of separate columns for "Elective Deferral" and "Employer Discretionary" reflects the fact that Plaintiff's account contained both employee and employer contributions and that a loan taken by Plaintiff from the 401(k) account would be derived from (and later repaid to) these two sources. (*See* ECF No. 118-16.) This interpretation of the charts is also supported by a third chart, offered by Defendants and produced by Plaintiff in discovery, that shows the outstanding balance of Plaintiff's loan decreasing by $85.36—the amount deducted from each of Plaintiff's paychecks—each pay period. (*See* ECF No. 118-5.) The uncontroverted evidence presented by the parties demonstrates that Defendants remitted Plaintiff's loan payments to his account in their entirety.

Plaintiff cites the findings of a 2019-2021 Department of Labor investigation of the 401(k) Plan in support of his contention that Defendants failed to remit loan payments to participants' accounts. Plaintiff presents evidence that on July 30, 2020, the Department of Labor sent Defendants a letter stating that it found "that from January 2015 through December 2019, [Defendants] failed to timely remit $27,729.47 in employee contributions and loan payments and failed to remit $1,182.67 in loan payments withheld from participants' paychecks to the Plan" in violation of ERISA. (ECF No. 122-4 at 3.) Plaintiff presents evidence that after Defendants responded to the letter and disputed their liability, the Department of Labor replied, stating that "we believe our original position is correct," but that "[d]espite your refusal to undertake the full corrective action we deem necessary, we have decided that legal action by the Department will not be commenced at this time." (ECF No. 122-6 at 2.)

While the Department of Labor found that Defendants failed to remit (or failed to timely remit) loan payments to other participants, the remittance schedule the Department provided demonstrates that Plaintiff's account was not affected—the first untimely or unremitted payment identified by the Department occurred after Plaintiff's loan was repaid in full. (*See* ECF No. 125-3 at 8 (identifying the first unremitted payment as occurring on July 8, 2016, and the first untimely payment as occurring on October 14, 2016); ECF No. 118-5 at 4 (stating that Plaintiff's loan was paid in full as of June 3, 2016).) More fundamentally, the findings of the Department of Labor are not binding on this Court and are not themselves evidence because the imposition of civil liability against Defendants—who disputed the Department's findings—would have required the Department to prove its case in court. *See* 29 U.S.C. § 1132 (stating that the Department of Labor has the power to enforce the provisions of ERISA by filing a civil action); *see also* ECF No. 125-3 at 4 (stating that if Defendants did not correct the violations identified by the Department of Labor, the Department of Labor "may refer the matter to the Office of the Solicitor of Labor for possible legal action").

///

### 3. Safe Harbor Matching Contributions

The 2016 Adoption Agreement and Basic Plan Document were adopted on April 3, 2017, effective retroactive as of September 1, 2016, the beginning of the plan year in which Plaintiff was terminated. (*See* ECF No. 118-3 at 10-11.) The 2016 Adoption Agreement states that the 401(k) Plan is intended to be a safe harbor plan with an enhanced match of "100% of salary deferrals up to 4% of Plan Compensation." (*See* ECF No. 118-13 at 9.) Safe harbor status enables a 401(k) plan to automatically satisfy certain nondiscrimination requirements by making safe harbor matching contributions to eligible participants' accounts without having to pass the Actual Deferral Percentage ("ADP") and Actual Contribution Percentage ("ACP") nondiscrimination tests. *See* 26 C.F.R. §§ 1.401(k)-3, 1.401(m)-3; 26 U.S.C. §§ 401(k)(12), (m)(11).

The Basic Plan Document provides:

> The Employer may elect [in the Adoption Agreement] to apply the Safe Harbor 401(k) Plan provisions under this Section [ ]. For this purpose, the Plan satisfies the requirements of this Section [ ] if the Plan is a Safe Harbor 401(k) Plan, as described in subsection (a) …. If the Plan qualifies as a Safe Harbor 401(k) Plan, the ADP Test … [and] ACP Test [are] deemed satisfied [subject to additional conditions]. To qualify as a Safe Harbor 401(k) Plan, the requirements under this Section [ ] must be satisfied for the entire Plan Year …. [I]t is impermissible to use the ADP and ACP Test for a Plan Year in which the Plan is intended to be a Safe Harbor 401(k) Plan and the requirements of this Section [ ] are not satisfied for the entire Plan Year.

(ECF No. 118-14 at 3.) Subsection (a) further provides that to "qualify as a Safe Harbor 401(k) Plan, the Plan must provide a Safe Harbor Contribution" and must satisfy various requirements, including the provision of advance notice to participants. *Id.* at 3-4. The evidence presented by the parties demonstrates that Defendants did not provide notice of safe harbor status or make safe harbor matching contributions for the plan year beginning on September 1, 2016.

Defendants contend that the 401(k) Plan failed to qualify as a safe harbor plan because no advanced notice was provided to participants. Defendants contend that it would have been impossible for such notice to have been provided for the plan year beginning on

September 1, 2016, because the 2016 Adoption Agreement and Basic Plan Document were not adopted until April 3, 2017, midway through the plan year. Defendants contend that because the 401(k) Plan did not (and could not) qualify as a safe harbor plan, Defendants were not obligated to make safe harbor matching contributions.

Defendants are correct that notice to plan participants is a prerequisite to a 401(k) plan properly claiming safe harbor status. However, Defendants do not provide any support for the position that a plan intended to operate as a safe harbor plan that fails to provide adequate notice can proceed as if it were a non-safe harbor plan—i.e. by opting to perform the nondiscrimination testing and not make safe harbor matching contributions. To the contrary, the statement in the Basic Plan Documents that "it is impermissible to use the ADP and ACP Test for a Plan Year in which the Plan is intended to be a Safe Harbor 401(k) Plan and the requirements of this Section [ ] are not satisfied for the entire Plan Year," (ECF No. 118-14 at 3), explicitly forbids plan administrators from reverting to the default testing requirements. This suggests that an operational failure such as a failure to provide notice must be remedied in other ways and does not justify withholding of safe harbor matching contributions. *See also Fixing Common Plan Mistakes – Failure to Provide a Safe Harbor 401(k) Plan Notice*, Internal Revenue Serv., https://www.irs.gov/retirement-plans/fixing-common-plan-mistakes-failure-to-provide-a-safe-harbor-401k-plan-notice ("The failure to provide a safe harbor notice is a failure to operate the plan in accordance with its safe harbor provisions. The plan has an operational failure because it failed to operate in accordance with the terms of the plan document. The plan sponsor cannot 'opt out' of safe harbor plan status for the year simply by performing the ADP/ACP tests for the year of the failure…. The appropriate correction for a late safe harbor 401(k) notice depends on the impact on individual participants. For example, if the missing notice results in an employee not being able to make elective deferrals to the plan (either because he was not informed about the plan, or informed about how to make deferrals to the plan), then the employer may need to make a corrective contribution that is similar to what might be required to correct an erroneous exclusion of an eligible employee."). Defendants' further

assertion that advance notice was impossible because the 2016 plan documents were not adopted until mid-year and were made retroactively effective does not change this result, particularly given that guidance on mid-year changes to safe-harbor plans has been issued by the IRS. *See* IRS Notice 2016-16 (Feb. 16, 2016). The Court concludes that Plaintiff provides evidence that establishes a genuine dispute of material fact as to whether Defendants breached their fiduciary duties by failing to make safe harbor matching contributions to the 401(k) Plan pursuant to the 2016 plan documents.

### 4. Standing

Defendants assert in the alternative that Plaintiff lacks Article III and statutory standing to bring his second and third claims. ERISA plaintiffs must satisfy the Article III requirement of demonstrating a cognizable injury caused by the defendant's conduct and redressable by the Court. *See Glanton ex rel. ALCOA Prescription Drug Plan v. AdvancePCS Inc.*, 465 F.3d 1123, 1127 (9th Cir. 2006) (recognizing that plan beneficiaries can sue on behalf of plans if they satisfy the Article III injury requirement by having "a concrete stake in the outcome of the proceedings"). To have statutory standing, an ERISA plaintiff must also be a "participant, beneficiary or fiduciary" of the plan. 29 U.S.C. § 1132(a). The term "participant" means "any employee or former employee of an employer … who is or may become eligible to receive a benefit of any type from an employee benefit plan which covers employees of such employer." 29 U.S.C. § 1002(7).

The Court has determined that there is a genuine dispute as to whether Defendants breached their fiduciary duties by failing to make safe harbor matching contributions to the 401(k) Plan in 2016, including to Plaintiff's individual account. Further, while the Court previously determined that Plaintiff's claims for benefits in this action were barred by the limitations period provided by the 401(k) Plan (*see* ECF No. 114 at 19), Plaintiff remains a participant in the 401(k) Plan for standing purposes because, at a minimum, he may be entitled to reinstatement should he prevail on his ERISA retaliatory discharge claim. *See Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 118 (1989) (stating that a former employee with a "reasonable expectation of returning to covered employment" is a

participant under ERISA (quotation omitted)); *McBride v. PLM Intern., Inc.*, 179 F.3d 737, 744 (9th Cir. 1999) (stating that relief for retaliatory discharge may include reinstatement). The Court concludes that Plaintiff has standing at this time.

**5. Duplicative Relief**

Defendants assert in the alternative that they are entitled to summary judgment on Plaintiff's third claim, brought under ERISA's catchall provision, 29 U.S.C. § 1132(a)(3), because the claim is duplicative of Plaintiff's second claim for breach of fiduciary duty under 29 U.S.C. § 1132(a)(2). Plaintiff contends that he seeks distinct remedies under the two claims and that claims under different subsections of ERISA may proceed simultaneously so long as there is no double recovery.

In *Moyle v. Liberty Mut. Retirement Ben. Plan*, 823 F.3d 948 (9th Cir. 2016), the Court of Appeals held that ERISA plaintiffs can proceed simultaneously on a claim for benefits under § 1132(a)(1)(B) and on a claim for equitable relief under 29 U.S.C. § 1132(a)(3) "so long as there is no double recovery." *Id.* at 961. However, plaintiffs may not utilize the catchall provision to seek the same relief available under a separate ERISA subsection. *See Wise v. Verizon Comms., Inc.*, 600 F.3d 1180, 1190 (9th Cir. 2010).

In this case, Plaintiff's second and third claims are both premised on the same theory of liability regarding Defendants' breach of fiduciary duty. Further, the Court has granted summary judgment to Defendants on Plaintiff's first claim for benefits, and on the second and third claims to the extent those claims seek the payment of benefits. Plaintiff lists several remedies he seeks but does not identify any remedy that remains available under § 1132(a)(3) that is not also available under § 1132(a)(2). The Court concludes that Defendants are entitled to summary judgment on Plaintiff's third claim on the grounds that it is duplicative of Plaintiff's second claim. *See Moyle*, 823 F.3d at 961 (explaining that plaintiffs may present "alternative—rather than duplicative—theories of liability" and that a claim under the catchall provision "can proceed simultaneously if [it] plead[s] distinct remedies").

///

## V. RETALIATORY DISCHARGE CLAIM

Defendants contend that they are entitled to summary judgment on the fourth claim in the SAC for retaliatory discharge pursuant to 29 U.S.C. § 1132(a)(3) because "Plaintiff's allegations of 'fraudulent concealment'"—the basis for tolling the statute of limitations on the claim—are "entirely unfounded." *Id.* Defendants contend that the SPD provided to Plaintiff on December 14, 2016, (the "Disputed 2015 SPD"), did not conceal the basis for Plaintiff's interference claim because it was a "truthful and accurate copy" that described the 401(k) Plan then in effect, as restated in plan documents made effective as of 2015. *Id.* at 22-23.

Plaintiff contends that tolling of the statute of limitations on his interference claim is appropriate due to Defendants' fraudulent concealment of the claim. Plaintiff contends that his assertion of fraudulent concealment is supported by evidence demonstrating the inauthenticity of the Disputed 2015 SPD, as well as other plan documents documenting a purported restatement of the 401(k) Plan in 2015.

Plaintiff claims that he was terminated in 2016 in retaliation for requesting 401(k) Plan documents. The Court has previously determined that the statute of limitations that applies to this claim expired on November 29, 2018, more than one year before Plaintiff initiated this action. (*See* ECF No. 45 at 20.) However, tolling of the statute of limitations is appropriate if Plaintiff can provide evidence to support his allegations that shortly after his termination, he was provided fraudulent plan documents that "rule[d] out his suspicions that his termination was connected to his request for documents" until he became aware of the fraudulent nature of the documents in January 2019. (ECF No. 64 ¶ 55); *see Hexcel Corp. v. Ineos Polymers, Inc.*, 681 F.3d 1055, 1060 (9th Cir. 2012) ("A statute of limitations may be tolled if the defendant fraudulently concealed the existence of a cause of action in such a way that the plaintiff, acting as a reasonable person, did not know of its existence.").

The parties present evidence that on December 14, 2016, less than three weeks after Plaintiff received notice of his termination, the third-party administrator of the 401(k) Plan

provided Plaintiff with the Disputed 2015 SPD, which states that it "describes the [401(k)] Plan as restated effective January 1, 2015." (ECF No. 118-15 at 9.) Defendants further present the Declaration of David Barka, which states that the Disputed 2015 SPD provided to Plaintiff was "a truthful and accurate copy of the 401(k) Plan's then-latest updated SPD." (ECF No. 118-6.) To carry his burden at summary judgment, Plaintiff must present evidence that establishes a genuine dispute as to whether the Disputed 2015 SPD was authentic.

Plaintiff presents four documents in support of his assertion that the Disputed 2015 SPD was fraudulent. First, Plaintiff presents the Administrative Record produced to him February 5, 2019, which does not include the Disputed 2015 SPD or other purported 2015 plan documents. Second, Plaintiff presents an email from a representative of Calbiotech sent on November 28, 2018, that states that the 2011 plan documents were "in effect from September 1, 2011 through August 31, 2016." (ECF No. 122-11 at 2.) Third, Plaintiff presents the purported 2015 Adoption Agreement, which states that it was adopted on April 26, 2016, and effective January 1, 2015, but further provides that "[t]he date specified [as the effective date] for an amended and restated plan … may not be earlier than the first day of the Plan Year during which the amended and restated Plan is adopted by the Plan Sponsor." (*See* ECF No. 125-6 at 5.) Fourth, Plaintiff presents a September 1, 2016, resolution by the Board of Calbiotech authorizing the adoption of a restatement of the 401(k) Plan in 2016, which states that "the Corporation has maintained the [401(k) Plan)] since 9-1-2011." (ECF No. 122-13 at 2.)

The absence of the 2015 plan documents from the Administrative Record initially produced to Plaintiff and Calbiotech's representation that the 2011 version of the 401(k) Plan was in effect until 2016 support an inference that the Disputed 2015 SPD and other purported 2015 plan documents are inauthentic. While Defendants' contention that these discrepancies were the result of inadvertent errors rather than fraud is plausible, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts" are functions of the factfinder, "not those of a judge" at summary

judgment. *Anderson*, 477 U.S. at 255. The Court concludes that summary judgment on Plaintiff's claim for interference should be denied because Plaintiff has provided adequate evidence for a fact-finder to find that Defendants fraudulently concealed Plaintiff's claim, tolling the statute of limitations.

## VI. CONCLUSION

IT IS HEREBY ORDERED that the Motion for Summary Judgment is granted in part and denied in part. The motion is granted as to Defendants' request for summary judgment on the following: (1) Plaintiff's second claim under 29 U.S.C. § 1132(a)(2) to the extent the claim is based on Defendants' failure to make matching contributions to the 401(k) Plan, as required by the 2008 and 2011 plan documents or Defendants' failure to remit loan payments deducted from participants' paychecks to their 401(k) accounts; and (2) Plaintiff's third claim under 29 U.S.C. § 1132(a)(3). The motion is otherwise denied.

Dated: January 3, 2023

Hon. William Q. Hayes
United States District Court